UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**Gaelle Valbrun,**

    **Plaintiff,**

    v.

**Millikin University,**

    **Defendant.**

## COMPLAINT

Plaintiff, Gaelle Valbrun, by and through her attorney, T. Andrew Horvat of Horvat Law, LLC, brings this action pursuant to Title VI of the Civil Rights Act of 1964 and related claims in violation of federal and Illinois law. In support thereof, Ms. Valbrun asserts as follows:

### Jurisdiction and Venue

1. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 as Plaintiff seeks redress for Defendant's violation of federal law.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367.

3. Venue is proper pursuant to 28 U.S.C. U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

### Parties

4. Gaelle Valbrun ("Plaintiff" or "Ms. Valbrun") is the Plaintiff in the above-entitled matter. Ms. Valbrun is a former graduate student at Millikin University's School of Nursing who at

all relevant times resided in Decatur, IL.

5. Millikin University ("Millikin" or "the University") is the defendant in above-entitled matter. Millikin University is a private university located in Decatur, IL. On information and belief, Millikin University receives federal financial assistance to operate its educational programs and activities.

## Facts

6. Millikin University is composed of numerous colleges and departments, including the School of Nursing ("SON").

7. At all relevant times, the SON worked in conjunction with area hospitals to provide internship opportunities for professionally registered nurses holding a Bachelor of Science in Nursing degree or a Master of Science in Nursing degree in order for them to complete the Doctor of Nursing Practice degree with specialization as a Registered Nurse Anesthetist ("DNP-NAP").

8. To receive a Doctor of Nursing Practice degree, DNP-NAP students are required to successfully complete eighty-eight (88) credit hours in addition to 2400+ hours of clinical practice and residency at various local hospitals.

9. Upon completion of the program's requirements, students are eligible to take the National Certification Examination administered by the National Board of Certification and Recertification of Nurse Anesthetics ("NBCRNA.").

10. At all relevant times, the employment rate six (6) months after graduation from the University's DNP-NAP program was 100%.

11. On or about April 8, 2020, Ms. Valbrun was accepted into the DNP-NAP program.

12. In exchange for paying tuition to Millikin, Millikin agreed to confer a Doctor of Nursing to Ms. Valbrun upon her successful completion of the degree's requirements.

13. In addition, and in consideration for tuition paid to Millikin, the University and its employees agreed to abide by the rules and procedures promulgated and outlined in its "Student Conduct Process" contained in Millikin's Student Handbook ("Student Conduct Process"), the School of Nursing Graduate Student Handbook ("graduate handbook"), and the Registered Nurse Anesthesia Intern Handbook ("RNAI handbook").

14. At all relevant times, Millikin and its School of Nursing provided a robust and multi-layered system of process to its students before the University could take disciplinary action against a student.

15. Ms. Valbrun, a successful student with no substantive history of disciplinary issues, brings this lawsuit to remedy numerous violations of state and federal law, including the Defendants' race-based discrimination and refusal to provide her with the copious amounts of process promised to her before arbitrarily expelling her from the DNP-NAP program.

**Ms. Valbrun Begins Her Studies in the DNP-NAP Program.**

16. In or about January of 2021, Ms. Valbrun began her internship as a Registered Nurse Anesthesia Intern ("RNAI").

17. At all relevant times, Dana Flatley ("Ms. Flatley") was employed by Millikin as the program director for the University's Nurse Anesthesia Program and was responsible for overseeing, supervising, and disciplining the RNAIs including Ms. Valbrun.

18. One of the few Black students in the DNP-NAP program, Ms. Valbrun successfully completed her first year in the program, earning good grades and stellar reviews.

19. Ms. Valbrun's initial success would prove to be short-lived.

**Ms. Flatley Begins to Target Ms. Valbrun.**

20. In January of 2022, at the beginning of Ms. Valbrun's second year in the program, Ms. Flatley failed to give Ms. Valbrun an internship rotation with St. John's Hospital, an affiliate of

Millikin's School of Nursing that provided internship opportunities for RNAIs in Millikin's DNP-NAP program.

21. No explanation was given for denying Ms. Valbrun this internship rotation.

22. The decision to deny Ms. Valbrun a rotation at St. John's Hospital was particularly troubling as St. John's Hospital is where students in the DNP-NAP program performed rotations in their thirds and final year in the program.

23. Being denied the opportunity to intern during her second year at St. John's placed Ms. Valbrun in a distinct disadvantage as, unlike her peers, she would be entering her final year rotation at St. John's without any previous experience with the facility, its staff, its equipment, and its policies and procedures.

24. The only other student in the DNP-NAP program who was not given a rotation at St. John's Hospital during their second year was "N.N.," one the few Black students other than Ms. Valbrun in the program.

**Ms. Valbrun is Placed on Probation**.

25. On or about July 13, 2022, Ms. Valbrun received a "safety concern" over an allegedly incomplete anesthesia care plan authored by Ms. Valbrun while she was interning at a local hospital.

26. "Safety concerns" are documented performance concerns over a RNAI's performance in administering medical care to patients. These concerns can be given directly by Ms. Flatley or by an on-site Nurse Anesthetists ("CRNA") the student is assigned to work with for the day.

27. At all relevant times, the decision to escalate a safety concern and "write up" up a student was within the discretion of Ms. Flatley.

28. During the conference with Ms. Flatley to discuss her performance, Ms. Flatley informed Ms. Valbrun that the next "safety concern" would be brought to the attention of the RNAI

4

Oversight Committee which could result in probation or dismissal from the program.

29. The conference with Ms. Flatley resulted in Ms. Flatley documenting the issue and placing Ms. Valbrun on an improvement plan.

30. The documentation and placing of Ms. Valbrun on an improvement plan was disparate in relation to her peers. In fact, some of her more senior non-Black peers in the program, of whom more skill and knowledge was expected, were not placed on improvement plans despite receiving similar "safety concerns."

31. In or about August of 2022, a second "safety concern" for allegedly failing to provide sufficient information in a care plan was submitted to Ms. Flatley by Ms. Flatley's friend, a CRNA who was supervising Ms. Valbrun while interning at Decatur Memorial Hospital.

32. During a meeting with Ms. Flatley to discuss the safety concerns, Ms. Flatley berated Ms. Valbrun, calling Ms. Valbrun "weak" and making additional comments suggesting that Ms. Flatley had a personality conflict with Ms. Valbrun.

33. Ms. Flatley's comments were not isolated. In fact, on previous occasions Ms. Flatley had commented on Ms. Valbrun's "flat affect" and "lack of personality" while in the presence of Ms. Valbrun's peers.

34. As a result of Ms. Flatley's recommendation, Ms. Valbrun was placed on probation.

35. The decision to place Ms. Valbrun on probation was disparate in relation to Ms. Valbrun's peers. In fact, other non-Black peers of Ms. Valbrun had authored insufficient care plans and were never subject to disciplinary action, much less placed on probation.

36. In addition, Ms. Valbrun's clinical evaluations, prepared from notes authored by CRNAs directly overseeing the interns, failed to document any "safety concerns" with Ms. Valbrun and instead awarded Ms. Valbrun exemplary scores for patient safety.

37. Ms. Valbrun's would file an internal grievance University challenging her disparate

treatment in being placed on probation. Ms. Valbrun's grievance and requested relief was subsequently denied.

**Ms. Flatley Continue to Discriminate against Ms. Valbrun.**

38. In August of 2022, Ms. Valbrun was denied an additional rotational opportunity at Springfield Memorial Hospital. As with the previous denials, other similarly situated non-Black students were not denied the opportunity.

39. No explanation was given for denying Ms. Valbrun a rotation at Springfield Memorial.

40. The only other student denied the same opportunity was "N.N.," one of the few Black students in the program along with Ms. Valbrun.

41. Moreover, in September of 2022, Ms. Valbrun was removed from her clinical rotation at the Carle Foundation Hospital in Urbana, Illinois after only one week at the facility.

42. Ms. Valbrun was removed despite positive evaluations from Carle staff.

43. The purported reason for Ms. Valbrun's removal was "preceptor fatigue."

44. The excuse of "preceptor fatigue" was pretextual. Instead, Ms. Valbrun and N.N., both Black, were the only students who were pulled from their rotations at Carle Foundation Hospital while their non-Black colleagues were allowed to continue.

**Ms. Flatley Retaliates against Ms. Valbrun.**

45. In response to her disparate treatment, on February 6, 2023, Ms. Valbrun formally complained to the Vice President of Student Affairs, Ms. Raphaella Prange.

46. Specifically, Ms. Valbrun complained of Ms. Flatley's discriminatory behavior directed at Ms. Valbrun and her Black classmate, N.N.

47. No remedial action would be taken by the University to address Ms. Valbrun's concerns.

48. On March 6, 2023, shortly after Ms. Valbrun lodged her complaint with the Vice President of Student Affairs, Ms. Flatley approached Ms. Valbrun in an aggressive manner and

berated Ms. Valbrun, demanding to know why Ms. Valbrun had failed to attend a classmate's presentation even though attendance was voluntary.

49. Ms. Flatley's conduct was disparate in relation to Ms. Valbrun's peers. In fact, other non-Black peers of Ms. Valbrun who had likewise decided against attending the voluntary presentation suffered no similar hostility.

50. As with previous incidents of disparate treatment, Ms. Valbrun would complain about Ms. Flatley's conduct without any remedial action being taken by the University.

51. On April 21, 2023, frustrated with her treatment at the hands of Ms. Flatley, and dismayed by the lack of action taken by the University, Ms. Valbrun filed a complaint based on Ms. Flatley and the University's discriminatory and retaliatory conduct with the Department of Education's Office of Civil Rights.

52. Instead of tempering Defendants' conduct, the ongoing retaliation would soon escalate and cause irreparable damage to Ms. Valbrun.

**The University Expels Ms. Valbrun.**

53. In June of 2023, Ms. Flatley authored a disciplinary report against Ms. Valbrun for being tardy. In fact, Ms. Valbrun was not tardy and, despite repeated requests, and Ms. Flatley refused to produce any proof of the allegation.

54. As with other disciplinary actions taken by Ms. Flatley, writing up Ms. Valbrun for being tardy was disparate in relation to Ms. Valbrun's peers. In fact, other non-Black peers of Ms. Valbrun were tardy to their rotations without disciplinary action being taken against them.

55. On June 21, 2023, Ms. Valbrun was scheduled to administer a drug known as Versed to a patient before surgery at Springfield Memorial Hospital.

56. However, because surgery was delayed past Ms. Valbrun's shift, the administration of Versed was assigned to another member of the medical staff.

7

57. Upon leaving the Hospital, Ms. Valbrun forgot that the vile was in her pocket and therefore did not return it to the laboratory.

58. Instead, Ms. Valbrun left the vile of Versed along with other materials in her locker which she locked upon leaving the facility.

59. Approximately one hour later, hospital personnel called Ms. Valbrun to inquire into the location of the vile.

60. Based on the hospital's inquiry, Ms. Valbrun agreed to return to the facility to assist in locating the vile.

61. Upon returning to the facility, Ms. Valbrun was informed that the vile had been located in her locker.

62. The actions of Ms. Valbrun violated no explicit policy and resulted in no medical harm as the patient was given the medicine in a timely manner.

63. Attributing Ms. Valbrun's oversight to simple human error, and accounting for the fact that Ms. Valbrun had been receiving exemplary evaluations, Springfield Memorial Hospital took no adverse action and instead welcomed Ms. Valbrun back to continue her studies.

64. Despite making an innocent mistake that caused no harm, and despite the plethora of alternative and less-punitive corrective measures available to the University, on July 12, 2023, the University dismissed Ms. Valbrun from the DNP-NAP program upon the recommendation of Ms. Flatley,

65. The purported reasons for Ms. Valbrun's expulsion were a three-fold: 1) a "failure to comply with controlled substances reconciliation requirements or policies related to the handling of controlled substances; 2) the "failure to report incidences of controlled substances discrepancies or serious infractions related to drug administration occurring in the course of clinical instruction;" and 3) "communicating false information; failure to report errors made in

providing care to patients."

66. All three purported reasons for Ms. Valbrun's expulsion were factually false and pretextual. In fact, no policy or procedure was violated and despite repeated requests for documentation of the policies or procedures allegedly violated, at no time was Ms. Valbrun provided any such policies or procedures.

67. Moreover, as with the other instances of discipline taken against Ms. Valbrun, the expulsion of Ms. Valbrun from the program was disparate in relation to Ms. Valbrun's peers. In fact, other non-Black peers of Ms. Valbrun had failed to "comply with controlled substances reconciliation requirement or policies" and had not been expelled.

68. Moreover, other non-Black students of the program had previously been removed from their internships for discrepancies and poor performance without having been expelled from the program.

69. The decision to expel Ms. Valbrun was made by the RNAI's Oversight Committee upon the recommendation of Ms. Flatley.

**Ms. Valbrun Appeals her Expulsion.**

70. On July 13, 2023, Ms. Valbrun immediately filed a grievance challenging her expulsion.

71. On August 4, 2023, Ms. Andre Trump, the Graduate Chair of the University School of Nursing, denied Ms. Valbrun's grievance.

72. The reasons for denying Ms. Valbrun's were three-fold: 1) a "failure to comply with controlled substances reconciliation requirements or policies related to the handling of controlled substances; 2) the "failure report incidences of controlled substances discrepancies or serious infractions related to drug administration occurring in the course of clinical instruction;" and 3) the alleged failure of Ms. Valbrun to attend a grievance meeting on 8/4/23.

73. The reasons given for denying Ms. Valbrun's grievance were factually false and

9

pretextual.

74. Shortly thereafter, Ms. Valbrun appealed the denial of her grievance.

75. On September 7, 2023, Intern Dean of the School of Nursing, Elizabeth Gephardt, denied Ms. Valbrun's appeal.

76. The reasons for denying Ms. Valbrun's appeal and upholding her expulsion were two-fold:  1) a "failure to comply with controlled substances reconciliation requirements or policies related to the handling of controlled substances; and 2) the "failure report incidences of controlled substances discrepancies or serious infractions related to drug administration occurring in the course of clinical instruction."

77. As with the reasons given for denying Ms. Valbrun's grievance, the reasons given for denying Ms. Valbrun's appeal were factually false and pretextual.

78. Not only was the decision to expel Ms. Valbrun arbitrary, capricious, and undertaken in bad faith, but it was done in violation of University policy and procedures.

**The Defendants' Actions Violated the Millikin University Student Conduct Process.**

79. The Student Conduct Process, contained in Millikin's handbook, was at all relevant times applicable to all Millikin students, including those in the DNP-NAP program.

80. "Committed to fairness," striving to provide "diverse methods for resolution of student conduct violations," and intended to "protect the rights of involved parties," the Student Conduct Process outlines the conduct and policies students must adhere to and the procedures required before the University can take disciplinary action.

81. These policies and standards of conduct students must adhere to are applicable "to students on or off University-owned or affiliated property."

82. The University's Student Conduct Process does not permit the University to take disciplinary action against a student arbitrarily or otherwise in the absence of good cause.

10

83. Instead, the Student Conduct process lists seven (7) non-exhaustive categories of conduct covered by the Student Conduct Process that are "subject to investigation and resolution through the Student Conduct Process" before discipline can take place.

84. Proceedings under the Student Conduct Process are triggered by a written report sent to the student conduct officer.

85. Upon receipt of the report, the student conduct officer then sends a "formal communication" within fourteen days to the parties involved, informing the parties that a report has been filed, that an investigation will commence, and informing the student suspected of inappropriate conduct of his or her "procedural rights."

86. The Student Conduct Process marshals prohibited conduct into two separate categories, "Level One" and "Level Two" conduct, each giving rise to its own procedures.

87. In cases of Level Two conduct where suspension or expulsion is considered, the Dean of Campus life may convene a hearing panel of three to five "trained faculty and staff members."

88. To "ensure the full rights of fair process," a student involved in a Level Two hearing is entitled to:

    a. a written explanation of the student conduct process;

    b. a written statement of the conduct in question;

    c. a statement of the presumption of non-responsibility;

    d. notification of the right to an advisor or support person;

    e. the right to inspect evidence;

    f. notification of the time and place of the meeting or hearing;

    g. a list of witnesses to be called;

    h. notification of the names of the conduct board presiding over the hearing or meeting;

    i. the right to be present;

  j. the right to abstain from the hearing without an adverse inference of guilt;

  k. the right to be assisted by an advisor/support person;

  l. the right to make a statement;

  m. the right the right to call witnesses; and

  n. the right to cross-examine witnesses called against the student.

89. If found "more likely than not" to have engaged in conduct covered by the Student Conduct Process, the Student Conduct Process sets out a series of sanctions including a "student conduct warning, "student conduct probation," "student conduct suspension, and "student conduct expulsion."

90. In addition, further may be taken to cover specific situations including, restitution, suspension of privileges, etc.

91.  A finding that it is more likely than not that misconduct has occurred does not automatically trigger discipline. Instead, the University and its employees retain the discretion to impose discipline and the extent of the discipline imposed.

92. In the event the student is found in violation of Level Two conduct covered by the Student Conduct Process, the student has the right to appeal to the Vice President of Student Affairs. The right to appeal is limited to "new information of a substantive nature, a "substantive procedural error," or a "substantive misappropriate sanction."

93. The alleged conduct giving rise to Ms. Valbrun's expulsion did not violate the University handbook.

94. Moreover, the Defendants failed to provide Ms. Valbrun with the processes guaranteed by the Student Conduct Process, either before or after her expulsion from the DNP-NAP program.

**The Defendants' Actions Violated the Millikin University Registered Nurse Anesthesia Intern Handbook.**

95. In addition to the Student Conduct Process outlined in Millikin's Student Handbook, the School of Nursing maintains its own separate student handbook outlining student rights and disciplinary procedures for students in Nurse Anesthetist Program.

96. Despite maintaining its own handbook, the Registered Nurse Anesthesia Intern Handbook ("RNAI handbook") is not mutually exclusive.

97. Instead, the RNAI handbook incorporates the Millikin Student Handbook and its Student Conduct Process by reference numerous times throughout, specifically noting that DNP-NAP students are required to adhere to the Millikin Student Handbook and its mandates.

98. Like the Student Conduct Process, the RNAI handbook forbids the University from taking disciplinary action against a student absent good cause.

99. Instead, and in addition to the (7) non-exhaustive categories of conduct covered by the Student Conduct Process, the RNAI handbook lists an additional eleven (12) non-exhaustive instances of conduct that could violate the program's Code of Honor and Integrity Policy and subject a Registered Nurse Anesthesia Intern ("RNAI") to discipline.

100. In addition to the policies and procedures outlined in the Student Conduct Process and RNAI handbook, interns are expected to abide by the policies and procedures of the facilities at which they intern.

101. Furthermore, to define the rights and expectations of the interns and faculty, the RNAI handbook outlines the responsibilities of each. Among these include the faculties' responsibility to "provide the appropriate supervision and direction based on an intern's clinical experience" and an RNAI's right to the "[f]reedom to pursue their educational goals" and "fair and accurate evaluations of their progress in the educational program …."

102. To enforce the program's Code of Honor and Integrity Policy, the RNAI handbook provides for a process to monitor and sanction student behavior entitled the "Policy on Probation/Suspension/Dismissal of RNAs: Course Failure."

103. The "Policy on Probation/Suspension/Dismissal of RNAs: Course Failure" outlines three (3) general categories of conduct that can give rise to discipline such as probation and temporary suspension from DNP-NAP program.

104. In accordance with the RNAI handbook, an intern can only be placed on probation once during their time in the program. Moreover, although an intern can be suspended multiple times while in the program, if a suspension is initiated more than once during the intern's time in the program, dismissal will be recommended RNAI Oversight Committee.

105. In addition to probation and temporary suspension, the RNAI handbook also provides that an intern may be dismissed without a probationary period fourteen (14) identified infractions.

106. An intern may not be dismissed absent a consensus of the "RNAI Oversight Committee as recommended as recommended to the Program Director and SON Director."

107. As with the Student Conduct Process found in the University's general student handbook, a finding that an infraction occurred does automatically trigger discipline. Instead, the University and its employees retain the discretion to impose discipline, including probation, suspension, and dismissal.

108. Upon dismissal, the intern will receive notice of course failure and dismissal with a final transcript noting the dismissal being sent to the Council on Certification of the National Board of Certification and Recertification for Nurse Anesthetists.

109. The alleged conduct giving rise to Ms. Valbrun's expulsion did not violate the RNAI handbook.

110.    As with their willful violation of the Student Conduct Process, the University failed to provide Ms. Valbrun with the processes guaranteed by the RNAI handbook, either before or after her expulsion from the DNP-NAP program.

111.    Moreover, as with placing Ms. Valbrun on probation, the University's decision and use of discretion in expelling Ms. Valbrun from the DNP-NAP program was arbitrary, capricious, and undertaken in bad faith.

112.    At the time of Ms. Valbrun's expulsion, Ms. Valbrun was in compliance with all University rules and regulations, had committed no infractions of the University's rules and regulations, had completed all academic requirements necessary to graduate, and was in good academic standing.

**The Defendants' Action have Irreparably Harmed Ms. Valbrun.**

113.    As a result of the University's actions, Mr. Valbrun has suffered significant injury to her emotional well-being, her professional prospects, and her reputation.

114.    With respect to her emotional well-being, Ms. Valbruns has suffered extreme embarrassment and emotional distress that has necessitated use of mental health professionals and medication to ameliorate the harm done to her.

115.    Moreover, in applying to new schools to continue her education, Ms. Valbrun will be required to disclose her expulsion which will significantly, if not permanently, impede her ability to continue her education.

116.    In addition, should Ms. Valbrun find an educational institution willing to accept her and subsequently graduate, she will have to further disclose her expulsion to the National Board of Certification and Recertification of Nurse Anesthetics which will significantly risk her licensure as an Illinois RN.

117.    Moreover, and in addition to the permanent injury to her reputation and her

educational and professional prospects, the University's actions have denied Ms. Valbrun the opportunity to obtain a master's degree at the university of her choosing, have resulted in the loss of considerable sums of money in education and related expenses, will cost Ms. Valbrun additional money in lost credits upon transfer, and have delayed Ms. Valbrun's entry into the profession.

## COUNT I
### Violation of Title VI of the Civil Rights Act of 1964

118. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

119. As described more fully herein, on account of Ms. Valbrun's race, the University denied Ms. Valbrun the full and equal benefit of her contractual rights with Millikin University.

120. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

121. As a result of Defendant's conduct, Plaintiff has been injured.

## COUNT II
### Violation of the 42 U.S.C. § 1981; Equal Protection

122. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

123. As described more fully herein, on account of Ms. Valbrun's race, the University denied Ms. Valbrun the benefits of its programs and activities, and otherwise subjected her to discrimination.

124. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

125. As a result of Defendant's actions, Plaintiff has been injured.

## COUNT III
### Violation of the Illinois Human Rights Act (Discrimination)

126. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

127. As described more fully herein, on account of Ms. Valbrun's race, the University denied and refused to provide Ms. Valbrun the full and equal enjoyment of the facilities, goods,

and services provided by Millikin.

128. On or about November 28, 2023, Plaintiff obtained from the Illinois Department of Human Rights consent to opt-out of the administrative process and commence the present action.

129. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

130. As a result of Defendant's actions, Plaintiff has been injured.

## COUNT IV
### Violation of the Illinois Human Rights Act (Retaliation)

131. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

132. As described more fully herein, the University retaliated against Ms. Valbrun because she opposed conduct she reasonably and in good faith believed to be unlawful discrimination.

133. On or about On or about November 28, 2023, Plaintiff obtained from the Illinois Department of Human Rights consent to opt-out of the administrative process and commence the present action.

134. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

135. As a result of Defendant's actions, Plaintiff has been injured.

## COUNT V
### Breach of Written Contract

136. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

137. As described more fully herein, Plaintiff and Millikin entered into a binding contract that Millikin materially breached by disciplining and expelling Ms. Valbrun without cause and in violation of its own policies and procedures.

138. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

139. As a result of Defendant's actions, Plaintiff has been injured.

## COUNT VI
### Breach of Implied-in-Fact Contract

140. Pleading in the alternative to the existence of a written contract, and as described more fully herein, Plaintiff and Millikin entered into a binding contract that Millikin materially breached by disciplining and expelling Ms. Valbrun without cause and in violation of its own policies and procedures.

141. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

142. As a result of Defendant's action, Plaintiff has been injured.

## COUNT VII
### Unjust Enrichment

143. Pleading in the alternative to the existence of a contract, and as described more fully herein, by way of tuition, fees, and expenses paid to the University, the University has unjustly retained a monetary benefit to the Plaintiff's detriment.

144. Defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

145. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

146. As a result of Defendants' actions, Plaintiff has been injured.

## COUNT VIII
### Promissory Estoppel

147. Pleading in the alternative to the existence of a contract, and as described more fully herein, the University made and broke an unambiguous promise to Plaintiff to abide by its procedures and policies and further act in good faith in their dealings with Plaintiff.

148. Plaintiff relied on that promise with said reliance being expected and foreseeable to Defendants.

149. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

150. As a result of Defendant's actions, Plaintiff has been injured.

## COUNT IX
## Intentional Infliction of Emotional Distress

151. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

152. As described more fully herein, the University, by way of its employee's conduct, and intending that its conduct would cause severe emotional distress, or knowing that there was a high probability that their conduct would cause severe emotional distress, engaged in conduct that caused severe emotional distress to Plaintiff.

153. Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

154. As a result of Defendant's actions, Plaintiff has been injured.

## COUNT X
## Negligence

155. Pleading in the alternative to the intentional conduct alleged, and as described more fully herein, the University owed Plaintiff a duty to ensure and safeguard her rights in accordance with University policy and procedure.

156. As described more fully herein, through the actions of its employees, the University breached its duty by disregarding Plaintiff's rights and dismissing her from program.

157. As a result of Defendant's actions, Plaintiff has been injured.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in her favor and against the Defendants, order the Plaintiff reinstated to the DNP-NAP program, expunge any reference in her records or transcripts of her expulsion, order Plaintiff the process she is entitled to, award compensatory damages, punitive damages, attorneys' fees, and costs, as well as any other relief this Court deems just.

**Jury Trial Demanded**

Plaintiff hereby demands a trial by jury on all issues so triable.

                                                                          Respectfully submitted,

                                                                          *T. Andrew Horvat*
                                                                          Attorney for Plaintiff

*/s/ T. Andrew Horvat*
Horvat Law, LLC
155 N. Wacker Drive, Suite 4250
Chicago, IL 60606
312-803-4956
andrew@horvatlawllc.com
ARDC No. 6277684